UNITED STATES of America, Appellant,

v.

Mary Rose OAKAR and Joseph
DeMio, Appellees.

No. 96–3084.

United States Court of Appeals,
District of Columbia Circuit.

Argued January 16, 1997.

Decided April 18, 1997

Jonathan J. Rusch, Senior Litigation Counsel, U.S. Department of Justice, Washington, DC, argued the cause and filed the briefs for appellant. Eric H. Holder, Jr., U.S. Attorney, Washington, DC, and Thomas J. Eicher, Assistant U.S. Attorney, Philadelphia, PA, entered appearances.

David E. Frulla, Washington, DC, argued the cause for appellee Oakar, with whom Stanley M. Brand, Washington, DC, and Theodore V. Wells, Jr., Roseland, NJ, were on the brief.

John J. Ricotta and Mark P. Herron, Cleveland, OH, were on the brief for appellee DeMio.

Before: SILBERMAN, WILLIAMS and ROGERS, Circuit Judges.

Opinion for the Court filed by Circuit Judge ROGERS.

Opinion concurring in part and dissenting in part filed by Circuit Judge WILLIAMS.

ROGERS, Circuit Judge:

The United States appeals from the dismissal of count two of an indictment charging Mary Rose Oakar, a former Member of the United States House of Representatives, with violating the False Statement Act, 18 U.S.C. § 1001 (1994), by failing to disclose certain personal liabilities in a financial disclosure form that she submitted to the House Clerk pursuant to the Ethics in Government Act of 1978 ("Ethics Act"), 5 U.S.C. app. 4. The United States also appeals the striking of paragraph 17 and overt acts 20(v)-(x) from count four of the indictment, which charged Oakar and her former campaign aide, Joseph DeMio, with conspiracy to defraud the United States and to make and cause to be made false statements within the jurisdiction of the

Federal Election Commission ("FEC"). We affirm the dismissal of count two and reverse the striking of the allegations in count four.

## I.

These appeals arise out of investigations relating to the House Bank. On May 14, 1992, appellee Mary Rose Oakar submitted a disclosure statement for calendar year 1991 to the House Clerk pursuant to the Ethics Act. That Act requires government officials, including Members of Congress, to file annual disclosure statements detailing, with certain exceptions, their income, gifts, assets, financial liabilities and securities and commercial real estate transactions. *See* 5 U.S.C. app. 4 § 102; *United States v. Rose*, 28 F.3d 181, 183 (D.C.Cir.1994). These requirements were designed to increase public confidence in the federal government, demonstrate the integrity of government officials, deter conflicts of interest, deter unscrupulous persons from entering public service, and enhance the ability of the citizenry to judge the performance of public officials. *See* S. REP. NO. 95–170, at 21–22 (1978), *reprinted in* 1978 U.S.C.C.A.N. 4216, 4237–38. Although the financial disclosure requirements apply to all branches of the government, the task of assuring compliance among officials and employees of the several branches falls to separate entities. Members of the House of Representatives must file their disclosure forms with the Clerk of the House who, in turn, transmits them to the Committee on Standards of Official Conduct, which is the House Ethics Committee.[1] 5 U.S.C. app. 4

§§ 103(h)(1)(A)(i)(I), (j)(1); *see also id.* § 109(1). If a person required to file such a report either willfully fails to do so or willfully falsifies information, the Ethics Committee will refer the matter to the Attorney General, who has the authority to bring a civil action to impose a penalty of up to $10,000. *Id.* § 104(a), (b).[2] In addition, the Committee may take other "appropriate personnel or other action in accordance with applicable law or regulations." *Id.* 104(c).

On March 10, 1992, the House Ethics Committee released a report on its investigation into alleged irregularities at the House Bank. *See* H.R.REP. NO. 102–452 (1992). The Report stated that nineteen current and five former Members of Congress had abused their banking privileges by "repeatedly and routinely writing overdrafts in significant amounts." *Id.* at 29. On March 27, 1992, the Attorney General appointed retired Judge Malcolm R. Wilkey as Special Counsel to conduct a preliminary investigation into the House Bank matter. *See* CONGRESSIONAL QUARTERLY ALMANAC, 102d Cong., 2d Sess. (1992) at 23. Days later the House Ethics Committee published the names of the overdrawn Members, including appellee Oakar, in the Congressional Record. 138 CONG. REC. H2241–42 (daily ed. Apr. 1, 1992). Oakar was subsequently indicted for one count of conversion of public monies, 18 U.S.C. § 641, five counts of making false statements, *id.* § 1001, and one count of conspiracy to defraud the United States by impairing, impeding and defeating the FEC in the exercise of its functions and duties, and to make and

---

**1.** The President, Vice President, and other Executive Branch officials file their disclosure reports with the Director of the Office of Government Ethics. 5 U.S.C. app. 4 at § 103(b), (c). Members of the judiciary file their forms with the Judicial Conference. *Id.* at § 103(h)(1)(B). Members of the Senate file their disclosure statements with the Secretary of the Senate who submits them to the Select Committee on Ethics of the Senate. *Id.* § 103(j)(2).

**2.** 5 U.S.C. app. 4 § 104 provides, in relevant part:

(a) The Attorney General may bring a civil action in any appropriate United States district court against any individual who knowingly and willfully falsifies or who knowingly and willfully fails to file or report any information that such individual is required to report pur-

suant to section 102. The court in which such action is brought may assess against such individual a civil penalty in any amount, not to exceed $10,000.

(b) ... [E]ach congressional ethics committee ... shall refer to the Attorney General the name of any individual which such ... committee has reasonable cause to believe has willfully failed to file a report or has willfully falsified or willfully failed to file information required to be reported.

(c) ... [A] congressional ethics committee ... may take any appropriate personnel or other action in accordance with applicable law or regulation against any individual failing to file a report or falsifying or failing to report information required to be reported.

cause to be made false statements within the FEC's jurisdiction. *Id.* § 371. DeMio was charged only with the conspiracy.

Oakar and DeMio moved to dismiss certain counts of the indictment. As relevant here, Oakar argued that count two, alleging that her failure to disclose at least $50,000 in personal liabilities on her 1991 Ethics Act financial disclosure statement, constituted a false statement under § 1001, was barred after *Hubbard v. United States,* 514 U.S. 695, 115 S.Ct. 1754, 131 L.Ed.2d 779 (1995), because the statement was submitted to the House Clerk, rather than to a "department" or "agency" of the Executive Branch. Oakar also moved to strike the allegations in paragraphs 17 and 20(v)-(x) as surplusage under FED.R.CRIM.P. 7(d) on the ground that they did not "amount to, or provide any indication of, criminal activity, but instead squarely implicate first amendment protected rights to free press and speech." Oakar also claimed that such "media activity" was exempt from the "regulatory ambit" of the Federal Election Campaign Act, 2 U.S.C. §§ 431–455, which requires candidates for federal office to report contributions and expenditures to the FEC.

The district court granted the motion regarding counts two and four. As to count two, charging Oakar with making a false statement in violation of § 1001, the court ruled that "in light of the legislative history as reviewed by *Hubbard,* section 1001 was not intended to apply to the statements at issue here." *United States v. Oakar,* 924 F.Supp. 232, 237–38 (D.D.C.1996). As to count four, the court struck the challenged language, but stated that the government could present evidence as to these allegations at trial if it appeared that they were "relevant to other than First Amendment activities." *Id.* at 243. The government appeals both rulings.

## II.

■ Although the parties have not challenged the court's jurisdiction over this appeal, the court must "independently satisfy ourselves that it exists." *Rose,* 28 F.3d at 185 (quoting *International Bhd. of Teamsters v. Pena,* 17 F.3d 1478, 1481 (D.C.Cir. 1994)). The statutory basis for this appeal is 18 U.S.C. § 3731, which provides in pertinent part:

> In a criminal case an appeal by the United States shall lie to a court of appeals from a decision, judgment, or order of a district court dismissing an indictment or information or granting a new trial after verdict or judgment, as to any one or more counts, except that no appeal shall lie where the double jeopardy clause of the United States Constitution prohibits further prosecution.
>
> ....
>
> The provisions of this section shall be liberally construed to effectuate its purposes.

Thus, it is clear that this court has jurisdiction of the government's appeal of that portion of the district court's order dismissing count two. As to the portion of the order striking the allegations in count four, however, the jurisdictional issue is less clear because the district court did not dismiss that count in its entirety. This court has not previously addressed whether § 3731 provides jurisdiction over an appeal from an order dismissing only a portion of a count.

■ Most of the federal courts of appeals that have addressed the issue have concluded that the government may appeal an order striking only a portion of a count when the stricken allegations provide a "discrete basis for the imposition of criminal liability." *United States v. Sanabria,* 548 F.2d 1, 5 (1st Cir.1976), *rev'd on other grounds,* 437 U.S. 54, 98 S.Ct. 2170, 57 L.Ed.2d 43 (1978); *see United States v. Hill,* 55 F.3d 1197, 1199–1200 (6th Cir.1995); *United States v. Levasseur,* 846 F.2d 786, 788 (1st Cir.), *cert. denied,* 488 U.S. 894, 109 S.Ct. 232, 102 L.Ed.2d 222 (1988); *United States v. Tom,* 787 F.2d 65, 69 (2d Cir.1986); *United States v. Martin,* 733 F.2d 1309, 1310 (8th Cir.1984)(en banc), *cert. denied sub nom. Eklund v. United States,* 471 U.S. 1003, 105 S.Ct. 1864, 85 L.Ed.2d 158 (1985); *United States v. Marubeni America Corp.,* 611 F.2d 763, 764–65 (9th Cir.1980).[3]

**3.** It is unclear whether the Fifth Circuit has endorsed the "discrete basis" test. *Compare*

The Tenth Circuit, however, has recently rejected the "discrete basis" test, holding that "§ 3731 does not provide for an appeal of less than a full count of an indictment." *United States v. Louisiana Pacific Corp.,* 106 F.3d 345, 349 (10th Cir.1997).

Although the Tenth Circuit's approach is consistent with the usual construction of the word "count," we respectfully conclude that it fails to give sufficient weight to § 3731's command that its provisions be "liberally construed." In *Sanabria,* the Supreme Court concluded that § 3731 imposed "no statutory barrier to an appeal from an order dismissing only a portion of a count" because "Congress could hardly have meant appealability to depend on the initial decision of a prosecutor to charge in one count what could also have been charged in two...." 437 U.S. at 69 n. 23, 98 S.Ct. at 2181 n. 23. This interpretation of § 3731 requires a court to look beyond the formal division of an indictment into counts. Although the concurring opinion of Justice Stevens, on which the Tenth Circuit relied, argues that "count" is a "well-known and unambiguous term of art" that should be given its ordinary meaning, *id.* at 79, 98 S.Ct. at 2186–87 (Stevens, J., concurring), the majority of the Court endorsed a contrary view. Practical considerations also weigh in favor of the majority's construction of the term "count" because the Double Jeopardy Clause would prevent the government from appealing the district court's ruling after an acquittal. While Congress may not have intended to grant the government interlocutory review of every pretrial ruling, the weight of authority suggests that it did not intend to condition the government's right to appeal on formalities. Rather, Congress intended to "remove all statutory barriers to Government appeals and allow appeals whenever the Constitution would permit." *United States v. Wilson,* 420 U.S. 332, 337, 95 S.Ct. 1013, 1019, 43 L.Ed.2d 232 (1975). Consequently, we join those circuits that have permitted the government to appeal under § 3731 an order dismissing a

portion of a count that provides a discrete basis for the imposition of criminal liability.

The stricken allegations in count four charged that Oakar and DeMio borrowed money from a third party and used part of the loan to publish and distribute "community newspapers" supporting Oakar's reelection. Although these activities are not criminal in themselves, Oakar's failure to report them as contributions and expenditures in connection with her campaign might conceivably have been charged as a separate substantive offense.[4] *Cf. United States v. Terry,* 5 F.3d 874, 876 (5th Cir.1993). Furthermore, the government could have framed count four with the stricken allegations as the only overt acts charged, and the district court's order would have then have effectively dismissed the entire count by deleting an essential element of the crime. *See Levasseur,* 846 F.2d at 789–90. Thus, we conclude that the allegations at issue here provide a discrete basis for the imposition of criminal liability against Oakar and DeMio, and that the government is entitled to appeal the order striking them.

## III.

The government's challenges to the district court's order present, as to count two, a question of the effect of the Supreme Court's decision in *Hubbard,* overruling its long-standing interpretation of 18 U.S.C. § 1001, and, as to the stricken portions of count four, a more mundane question under Federal Rule of Criminal Procedure 7(d).

### A.

**Count two.** The government contends that the district court erred in two respects in striking count two of the indictment: first, because neither *Hubbard* nor subsequent decisions in this circuit have foreclosed the possibility that certain entities within the Legislative Branch might still be "agencies" for purposes of § 1001; and second, because, unlike other post-*Hubbard* cases in this circuit the indictment did not specify the

---

*United States v. Woolard,* 981 F.2d 756, 757 (5th Cir.), *reh'g denied,* 990 F.2d 819 (5th Cir.1993) *with United States v. Terry,* 5 F.3d 874, 876 (5th Cir.1993).

4. We express no opinion as to Oakar's contention that she was not required to report these activities. *See infra* n.13.

department or agency conferring § 1001 jurisdiction and Oakar's financial disclosure statement was within the jurisdiction of the Justice Department. Here the government looks to the Attorney General's civil enforcement authority under § 104 of the Ethics Act and the authority delegated to Special Counsel Wilkey to investigate the House Bank as bases of Executive Branch "jurisdiction" within the meaning of a 1934 amendment to § 1001.

Section 1001, as it read at the time of appellees' indictment,[5] provides:

> Whoever, in any *matter within the jurisdiction of any department or agency* of the United States knowingly and willfully falsifies, conceals or covers up, by any trick, scheme, or device a material fact, or makes any false, fictitious or fraudulent statements or representations, or makes or uses any false writing or document knowing the same to contain any false, fictitious or fraudulent statement or entry, shall be fined under this title or imprisoned not more than five years, or both.

18 U.S.C. § 1001 (emphasis added). For nearly forty years, the Supreme Court interpreted the emphasized language to embrace matters within the jurisdiction of any branch of the government, not only the Executive Branch.

In *United States v. Bramblett*, 348 U.S. 503, 75 S.Ct. 504, 99 L.Ed. 594 (1955), a former Member of Congress was charged under § 1001 for falsely representing to the House Disbursing Office that a named person was entitled to compensation as his official clerk. The district court had granted Bramblett's motion for arrest of judgment following his conviction on the ground that he had not falsified a material fact "within the jurisdiction of any department or agency of the United States" because the Disbursing Office was not a department or agency within the meaning of § 1001. *See* 348 U.S. at 505, 75 S.Ct. at 506. The government appealed, and the Supreme Court reversed. The Court reviewed the origins of § 1001, noting that it was originally passed in conjunction with a false claims provision to punish monetary frauds in "any claim upon or against the Government of the United States, or any department or officer thereof...." *See* Act of March 2, 1863, 12 Stat. 696 (1863). A 1934 amendment to the statute expanded its application to frauds committed by any person "in any matter within the jurisdiction of any department or agency of the United States...." *See* Act of June 18, 1934, 48 Stat. 996 (1934) ("1934 Act"). Although Bramblett claimed that the addition of the words "department or agency" in 1934 had limited the coverage of § 1001 to exclude statements to the Legislative and Judicial Branches, the Court found nothing in the text or the legislative history of the 1934 Act that indicated that "the scope of the statute was to be in any way restricted." *Id.* at 507, 75 S.Ct. at 507.

Noting that the district court had read the definitions of "department" and "agency" in 18 U.S.C. § 6[6] to restrict the scope of § 1001, the Court concluded instead that:

> [t]he context in which this language is used calls for an unrestricted interpretation. This is enforced by its legislative history. It would do violence to the purpose of Congress to limit the section to falsifications made to the executive departments. Congress could not have intended to leave frauds such as this without penalty. The development, scope and purpose of the section shows that "department" as used in this context, was meant to describe the

5. In 1996, Congress amended § 1001 to extend its coverage to "any matter within the jurisdiction of the executive, legislative, or judicial branch of the Government of the United States." False Statements Accountability Act of 1996, Pub.L. No. 104–292, § 2, 110 Stat. 3459 (1996).

6. Section 6 provides:
The term "department" means one of the executive departments ....unless the context shows that such term was intended to describe

the executive, legislative, or judicial branches of the government.
The term "agency" includes any department, independent establishment, commission, administration, authority, board or bureau of the United States or any corporation in which the United States has a proprietary interest, unless the context shows that such term was intended to be used in a more limited sense.
18 U.S.C. § 6.

executive, legislative and judicial branches of the Government.

*Id.* at 509, 75 S.Ct. at 508.[7] Accordingly, while noting that Bramblett's statement could arguably be considered a matter within the jurisdiction of the Treasury Department, and that the House Disbursing Office might arguably fall within the § 6 definition of agency, the Court declined to base its holding on these grounds, concluding that submission of a statement to any of the three branches of government created a basis for the application of § 1001. *Id.* at 509–10, 75 S.Ct. at 508.

In *Hubbard v. United States,* 514 U.S. 695, 115 S.Ct. 1754, 131 L.Ed.2d 779 (1995), the Court overruled *Bramblett, id.* at ——, 115 S.Ct. at 1765, and held that a federal court was neither a "department" nor an "agency" within the meaning of § 1001. *Id.* The occasion for the Court's reconsideration of *Bramblett* was a split in the circuits on whether a "judicial function exception" existed to § 1001. That exception, first suggested in *Morgan v. United States,* 309 F.2d 234 (D.C.Cir.1962), restricted the application of § 1001 in the federal courts. Prompted by concern that fear of prosecutions for false statements under § 1001 could chill zealous advocacy, the exception provided that while misrepresentations relating to a court's "administrative" or "housekeeping" functions were within the reach of § 1001, statements made in the course of adjudication were not. *See* 514 U.S. at ——, ———–——, 115 S.Ct. at 1757, 1761–62; *Morgan,* 309 F.2d at 237. Rather than eliminating the "judicial function" exception, the Court in *Hubbard* elimi-

nated the need for the exception by overruling *Bramblett.*[8]

The Court began by revisiting *Bramblett*'s analysis of the legislative history of § 1001. It observed that "[i]n ordinary parlance, federal courts are not described as 'departments' or 'agencies' of the Government," and that "[f]ar more common is the use of 'department' to refer to a component of the Executive Branch." *Hubbard,* 514 U.S. at ——, 115 S.Ct. at 1757. The Court viewed "[t]his commonsense reading [to be] bolstered by the statutory definitions of 'department' and 'agency' in 18 U.S.C. § 6," which are applicable to all of Title 18. *Id.* Finding nothing in the text of § 1001 or in any related legislation that would suggest that the presumptive definitions must yield, the Court concluded that *Bramblett* "must be acknowledged as a seriously flawed decision" that made "no attempt to reconcile its interpretation with the usual interpretation of 'department,'" and that gave "insufficient weight to the plain language of §§ 6 and 1001." *Id.* at ——–——, 115 S.Ct. at 1758–59.

Contrary to its holding in *Bramblett,* the Court now concluded that the 1934 Act did fundamentally alter the character of the false statement statute. *Id.* at ——, 115 S.Ct. at 1754. The Court noted that the 1934 Act had excised references to financial frauds, "thereby severing the historical link with the false claims portion of the statute, and inserted the requirement that the false statement be made 'in any matter within the jurisdiction of any department or agency of the United States.'" *Id.* at ——, 115 S.Ct. at

---

**7.** The court noted that several subsequent revisions had enacted only "housekeeping changes in language which are of no particular significance" to the interpretation of the Act. *Id.* at 507, 75 S.Ct. at 507.

**8.** The Justices were divided on their reasons for overruling *Bramblett.* Justice Stevens, joined by two justices, concluded that the development of the judicial function exception represented an "intervening development in the law" that justified reconsideration of *Bramblett.* 514 U.S. at ——, 115 S.Ct. at 1764 (per Stevens, J.) (quoting *Patterson v. McLean Credit Union,* 491 U.S. 164, 173, 109 S.Ct. 2363, 2370–71, 105 L.Ed.2d 132 (1989)). Additionally, Justice Stevens concluded that neither Congress nor government prosecutors had relied significantly on *Bramblett.* Jus-

tice Scalia, joined by one Justice, rejected the "intervening development" rationale, and viewed *Bramblett* as a decision with "unacceptable consequences" that the Court had not foreseen in 1949, and that could only be circumvented by adopting a "judicial function" exception at odds with the text of the statute. *Id.* at ——–——, 115 S.Ct. at 1765–66 (Scalia, J., concurring). In dissent, Chief Justice Rehnquist, joined by two Justices, argued that the Court should have applied the rule of stare decisis and left *Bramblett* undisturbed. *Id.* at ——–——, 115 S.Ct. at 1766–69 (Rehnquist, C.J., dissenting). Justice Thomas joined in the portions of Justice Stevens' opinion that commanded majority support, but did not join in either Justice Stevens' or Justice Scalia's rationale for departing from *Bramblett.*

1760. Viewing this addition as "critical for present purposes," the Court considered two competing inferences arising from the amendments to the statute: either that the addition of the "jurisdiction" requirement "impose[d] new words of limitation—whose ordinary meaning connotes the Executive Branch—in an altogether reformulated statute," or that the addition "strip[ped] away the financial fraud requirement while not disturbing the pre-existing breadth the statute has enjoyed." *Id.* at ——, 115 S.Ct. at 1760. The Court concluded that its adoption of the second inference in *Bramblett*, "though not completely implausible, [was] nevertheless unsound." *Id.* at ——, 115 S.Ct. at 1761. In the Court's words: "[t]he differences between the 1934 Act and its predecessors are too dramatic to evidence a congressional intent to carry forward any features of the old provision." *Id.* at ——, 115 S.Ct. at 1761. The Court noted that none of its opinions referred to any indication that the 1934 Act might apply outside the Executive Branch. *Id.* "In light of this vacuum, it would be curious indeed if Congress truly intended the 1934 Act to work a dramatic alteration in the law governing misconduct in the court system or the Legislature." *Id.* at ——, 115 S.Ct. at 1761.

Although *Hubbard* only directly addressed the applicability of § 1001 to statements made in judicial proceedings, the Court signaled that its rationale would apply equally to statements to the Legislative Branch. Because "[c]arefully considered language of the Supreme Court, even if technically dictum, generally must be treated as authoritative," *Doughty v. Underwriters at Lloyd's, London,* 6 F.3d 856, 861 n. 3 (1st Cir.1993), this court cannot ignore the unmistakable import of *Hubbard's* analysis. *See also Gaylor v. United States,* 74 F.3d 214, 217 (10th Cir.), *cert. denied,* —— U.S. ——, 116 S.Ct. 1830, 134 L.Ed.2d 934 (1996); *Reich v. Continental Casualty Co.,* 33 F.3d 754, 757 (7th Cir.1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 1104, 130 L.Ed.2d 1071 (1995). In revisiting the origins of § 1001 and the legislative history of the 1934 Act, the Court emphasized that Congress acted at the behest of the Secretary of the Interior and that its purpose was to address "the proliferation of fraud in the newly formed Executive agencies," rather than misconduct in the courts or the Legislature. *Hubbard,* 514 U.S. at ——, 115 S.Ct. at 1761. It is clear, moreover, that the justices understood that the decision to overrule *Bramblett* called § 1001's applicability to the Legislative Branch into serious doubt. In concluding that overruling *Bramblett* would not upset substantial reliance interests of Congress or of prosecutors on the availability of § 1001, three Justices noted the availability of other statutes for punishment of falsifications to the courts and the legislature. 514 U.S. at —— & n. 14, 115 S.Ct. at 1764 & n. 14 (per Stevens, J.). Justice Scalia, concurring, noted that although *Hubbard* did not pose the issue addressed in *Bramblett,* namely whether § 1001 applied to statements to the Legislative Branch, to treat the Legislative and Judicial Branches differently under the Act would create a "bizarre regime" contradictory to "the statute's intent ... [and] in addition, all conceivable interpretations of the English language." 514 U.S. at ——, 115 S.Ct. at 1766 (Scalia, J., concurring). Similarly, Chief Justice Rehnquist observed in dissent that under the majority's interpretation "the legislative process is no longer protected by § 1001." *Id.* at ——, 115 S.Ct. at 1768 (Rehnquist, C.J., dissenting).

In the wake of *Hubbard,* this court has been clear that an entity within the Legislative Branch cannot be a "department" within the meaning of § 1001 and 18 U.S.C. § 6. *United States v. Rostenkowski,* 68 F.3d 489, 490 (D.C.Cir.1995), *denying reh'g in* 59 F.3d 1291 (D.C.Cir.1995); *United States v. Dean,* 55 F.3d 640, 658–59 (D.C.Cir.1995), *cert. denied,* —— U.S. ——, 116 S.Ct. 1288, 134 L.Ed.2d 232 (1996). The government correctly notes, however, that both *Hubbard* and this court's decisions leave open the possibility that the Ethics Committee might be an "agency." *Hubbard,* —— U.S. at —— n. 5, 115 S.Ct. at 1759 n. 5; *Rostenkowski,* 68 F.3d at 490. Notwithstanding this narrow opening, however, we conclude that *Hubbard's* rationale and method of analysis foreclose this construction.

■ In *Hubbard,* the Court limited the scope of § 1001 to departments and agencies as defined in 18 U.S.C. § 6. Given the

Court's emphasis on a common-sense reading of those definitions, there is nothing to suggest that either the House Clerk or the House Ethics Committee is an "independent establishment, commission, administration, authority, board or bureau of the United States or [a] corporation in which the United States has a proprietary interest," *id.*, as any of those terms are commonly used. The House Ethics Committee is a deliberative body composed of Members of Congress and vested with authority under the Ethics Act and the House Rules to take action against Members who fail to fulfil their financial disclosure obligations. 2 U.S.C. § 29d; 5 U.S.C. app. 4 §§ 104, 106; Rules of the House of Representatives, 102d Cong., 2d Sess., Rule X, cl. 4(e). As such, it would not naturally be described by any of the terms enumerated in the definition of "agency" in 18 U.S.C. § 6. Indeed, the function of the Ethics Committee bears substantially less resemblance to the definition of "agency" in § 6 than does the House Finance Office, which was at issue in *Rostenkowski,* or the House Disbursing Office, which was at issue in *Bramblett.* Statements to congressional committees were not the focus of Congress' concern in enacting the 1934 Act, and the definition in § 6 describes entities that are ordinarily found only within the Executive Branch.

▮ The United States also contends, however, that even if Oakar's submission of her 1991 financial disclosure statement to the House Clerk does not confer § 1001 jurisdiction because the Ethics Committee is not a "department" or "agency," the Attorney General's authority to seek civil penalties for the falsification of Ethics Act filings under § 104(a), and Judge Wilkey's appointment as Special Counsel to investigate the House Bank established Executive Branch "jurisdiction" over Oakar's financial disclosure statement, so that she may still be prosecuted under § 1001. To support its contention that the Justice Department's authority to exam-ine Oakar's disclosure statement gives rise to jurisdiction under § 1001, the government relies on *United States v. Rodgers,* 466 U.S. 475, 104 S.Ct. 1942, 80 L.Ed.2d 492 (1984). In that case, the defendant was indicted for falsely reporting to the Federal Bureau of Investigation and the Secret Service that his wife had been kidnapped and that she was involved in a plot to assassinate the President. *Id.* at 476–77, 104 S.Ct. at 1944–45. The Supreme Court rejected Eighth Circuit precedent that "jurisdiction" for purposes of § 1001 required "power to make final or binding determinations," and held that "jurisdiction" under the statute was to be interpreted very broadly to exist whenever an agency or department received a statement on a matter within its "official, authorized functions." *Id.* at 477, 479, 104 S.Ct. at 1945, 1946. The government further points out that a statement may be within the jurisdiction of an entity covered by § 1001 even if it was originally submitted to a private or non-federal body. For example, in *United States v. Davis,* 8 F.3d 923, 929 (2d Cir.1993), the Second Circuit held that § 1001 jurisdiction existed where the defendant, a federal prisoner being held in a state prison facility pursuant to a contract between the state and the United States Marshals Service, made false statements to state officials. *Id.* In *Davis* and like cases,[9] the rationale for § 1001 jurisdiction was that although certain responsibilities may have been delegated to a non-federal entity, "supervisory authority" over the matter remained with the federal agency. *Davis,* 8 F.3d at 929.

Neither *Davis* nor the other cases cited by the government, however, involve situations in which two different branches of the federal government could be said to have "jurisdiction" over a matter. Indeed, this problem could not have arisen in the *Bramblett* era, when all branches of the government were treated identically for the purposes of § 1001. Under *Hubbard,* however, that Oakar's statements were matters within the

---

9. *See also United States v. Gibson,* 881 F.2d 318, 322 (6th Cir.1989); *United States v. Petullo,* 709 F.2d 1178, 1180 (7th Cir.1983); *United States v. Richmond,* 700 F.2d 1183 (8th Cir.1983); *United States v. Uni Oil, Inc.,* 646 F.2d 946, 954–55 (5th Cir.1981), *cert. denied,* 455 U.S. 908, 102 S.Ct. 1254, 71 L.Ed.2d 446 (1982); *United States v. Cartwright,* 632 F.2d 1290, 1292–93 (5th Cir. 1980); *United States v. Lewis,* 587 F.2d 854 (6th Cir.1978); *United States v. Waters,* 457 F.2d 805 (3d Cir.1972).

jurisdiction of the Ethics Committee does not mean that she can be prosecuted under § 1001. Thus, the question is whether, by granting the Attorney General authority to seek civil penalties for the making of false statements and to appoint Judge Wilkey to investigate the House Bank scandal, Congress intended to create Executive Branch "jurisdiction" within the meaning of § 1001.

In *United States v. Hansen*, 772 F.2d 940 (D.C.Cir.1985), this court concluded that § 1001 permitted the Attorney General to prosecute a Member of Congress for false statements made in his Ethics Act disclosure forms, reasoning that the congressional grant of authority to the Attorney General to initiate civil proceedings for Ethics Act violations did not implicitly repeal § 1001. The court found that, under *Bramblett*, "[t]he House Committee with which the forms were filed [was] a 'department' for purposes of § 1001." *Id.* at 943. Finding no "clear and manifest indication" of an intent to repeal § 1001 in the legislative history of the Ethics Act, *id.* at 948, the court concluded that the two statutes, read together, produced a "natural progression" where "those who intentionally fail to file [Ethics Act forms] are subject only to the civil sanction of [§ 104], while those who lie on their forms are additionally subject to the criminal penalty of § 1001." *Id.* at 945. Because the Supreme Court and this court have now concluded that Congress never intended to authorize § 1001 prosecutions for statements made to the Legislative Branch, *Hansen*'s holding is irrelevant, since it poses the wrong question.[10] The issue now is not whether Congress intended to repeal § 1001 by implication by enacting the civil penalty provision of § 104, but whether in enacting § 104, it intended to create Executive Branch "jurisdiction" where it would not otherwise exist. Thus, the absence of clear guidance in the legislative history, *see id.* at 947–48, now cuts in another direction, and leads to the conclusion that Congress did not intend to create new jurisdiction for the purposes of § 1001. Rather, at least until 1996, *see supra* n. 5, Congress plainly intended to vest primary authority for ensuring § 1001 compliance with the congressional ethics committees and the other analogous entities in the other branches.

█ In addition, because prosecution of Oakar for making false statements in her 1991 financial disclosure statement would not further the purposes of § 1001 as interpreted in *Hubbard*, the government's reliance on *Rodgers* is misplaced. *Rodgers'* construction of the term "jurisdiction" in § 1001 was tied to preventing the "perversion of ... authorized functions" of a covered branch, an interest the Supreme Court found "clearly embraced in, and furthered by, the broad language of § 1001." 466 U.S. at 482, 104 S.Ct. at 1947; *see also United States v. Facchini*, 874 F.2d 638, 642 (9th Cir.1989)(en banc). Unlike *United States v. Tracy*, 108 F.3d 473 (2d Cir.1997), the instant case does not involve statements submitted directly to an executive branch department or agency. The Second Circuit in *Tracy* rejected the defendant's argument that § 1001 did not apply to statements submitted to a United States Attorney because they pertained to an order issued by a judicial magistrate. Because "[t]he affidavits in question were not requested, filed, or even presented, to the court," the Second Circuit concluded that "[t]he difference between this case and *Hubbard*, simply put, is that defendant's false statements .... were designed to mislead or defraud that agency of the executive branch." *Id.* 108 F.3d at 477. The government offers nothing to indicate that Oakar's alleged falsifications were received by, much less relied upon by Judge Wilkey or his investigators.[11] Hence, there is no basis to conclude that the statements could have interfered with the work of the Executive Branch, and that rationale for the application of § 1001 is thus missing in Oakar's case.

**10.** We express no view as to *Hansen's* application under the 1996 amendments to § 1001, which effectively overrule *Hubbard* and codify the holding of *Bramblett*.

**11.** Compare dissenting opinion at 158–59. According to the Final Report: Preliminary Inquiry of the Special Counsel to the Attorney General Concerning the House Banking Facility 38 (Dec. 16, 1992) House Members' Ethics Act filings were relied upon in the investigation only "when necessary." [Exhibit 5 to Defendant's Motion to Dismiss Count One, Dkt. 20 of District Court record at 38].

Absent danger of such perversion, "[m]ere access to information" by a "department" or "agency" cannot give rise to § 1001 jurisdiction. *Facchini,* 874 F.2d at 642. "A criminal law is not to be read expansively to include what is not plainly embraced within the language of the statute, since the purpose to apprise men [and women] of the boundaries of the prohibited action would then be defeated." *Kordel v. United States,* 335 U.S. 345, 348–49, 69 S.Ct. 106, 109, 93 L.Ed. 52 (1948) (citations omitted).

Furthermore, as Justice Stevens observed in *Hubbard,* statements to the Judicial and Legislative Branches are subject to a "extensive array of statutes that already exist to penalize false statements," including statutes on perjury, 18 U.S.C. § 1621; false declarations before a grand jury, *id.* § 1623; obstruction of justice, *id.* § 1503; and false claims, *id.* § 287. 514 U.S. at ――― & n. 14, 115 S.Ct. at 1764 & n. 14 (per Stevens, J.). If the Attorney General's "jurisdiction" to investigate and prosecute such crimes were to render a statement to the courts or Congress a "matter within the jurisdiction of a department or agency" of the Executive branch, then the language of the 1934 Act would not constitute "words of limitation," *Hubbard,* 514 U.S. at ―――, 115 S.Ct. at 1760, but would instead invite artful prosecutorial pleading. Because the commencement of perjury prosecutions would be the foreseeable consequence of a false statement under oath, nothing in *United States v. Yermian,* 468 U.S. 63, 104 S.Ct. 2936, 82 L.Ed.2d 53 (1984), which held that the government need not prove a defendant's knowledge of federal agency jurisdiction to obtain a conviction under § 1001, would stand in the way of § 1001 prosecution for any sworn statement to the judicial branch. Because perjury prosecutions are unquestionably "official, authorized functions" of the Executive Branch within the meaning of *Rodgers,* 466 U.S. at 479, 104 S.Ct. at 1946, there is little room to dispute that, under the government's interpretation, this authority would render such prosecu-

tions "matters within the jurisdiction of" the Executive for purposes of § 1001. Thus, rather than alleviating the "unacceptable consequences," *id.* at ―――, 115 S.Ct. at 1765 (Scalia, J., concurring) of *Bramblett's* expansive interpretation of § 1001, the government's construction would directly contravene *Hubbard* by permitting prosecution for statements to the Judicial and Legislative Branches that the Court concluded were outside the intended scope of § 1001 as amended by the 1934 Act.

Finally, we note that the government does not suggest, nor can we identify, a limiting principle that would permit adoption of the government's construction of "matter within the jurisdiction of" without permitting § 1001 to be used as expansively as it was under *Bramblett.* See *Hubbard,* 514 U.S. at ―――, 115 S.Ct. at 1766 (Scalia, J., concurring). Were the Court's broad construction of "jurisdiction" in *Rodgers,* 466 U.S. at 479, 104 S.Ct. at 1946, sufficient to give the Justice Department § 1001 jurisdiction over Oakar's 1991 financial disclosure filing, it would likewise confer § 1001 jurisdiction over any sworn statement to the Judicial Branch. Due to *Hubbard's* eradication of the "judicial function" exception, were the government's position adopted, the possibility of § 1001 prosecution for courtroom statements would once again have the potential to inhibit vigorous advocacy.[12] See 514 U.S. at ―――, 115 S.Ct. at 1763. For these reasons, the language added by the 1934 Act, as interpreted in *Hubbard,* does not support the government's attempt to bring Oakar's disclosure filing within the scope of § 1001.

Accordingly, because § 1001 did not apply to Oakar's filing of her 1991 financial disclosure form with the House Clerk, we affirm the district court's dismissal of count two of the indictment.

### B.

**Count four portions.** The United States also contends that the district court erred in

---

**12.** The fact that Oakar's financial disclosure form stated that falsifications could be the subject of § 104(a) civil and § 1001 criminal sanctions, and that the appointment of Judge Wilkey was announced before she submitted her form to the House Clerk cannot create § 1001 jurisdiction where it would not otherwise exist. *See Sanabria,* 437 U.S. at 69, 98 S.Ct. at 2181. *See also, Yermian,* 468 U.S. 63, 104 S.Ct. 2936, 82 L.Ed.2d 53.

striking paragraph 17 and overt acts 20(v) through 20(x) of count four of the indictment under FED.R.CRIM.P. 7(d) in the absence of finding that the allegations were irrelevant to the charges and prejudicial to appellees. As noted, the stricken allegations charged that Oakar and DeMio used part of a loan made in the name of a third party to finance the publication and distribution of community newspapers supporting Oakar's reelection. In striking these allegations, the district court ruled that they "allege facts which implicate the protections of the First Amendment," but stated that it would permit the government to present evidence as to these allegations at trial if it appeared that they were "relevant to other than First Amendment activities." 924 F.Supp. at 243.[13]

■■■■ Our review of a district court's decision on a motion to strike surplusage from an indictment pursuant to Fed.R.Crim.P. 7(d), is for abuse of discretion. *United States v. Edmond,* 52 F.3d 1080, 1112 (D.C.Cir.1995) (per curiam); *United States v. Jordan,* 626 F.2d 928, 932 (D.C.Cir.1980). The scope of a district court's discretion to strike material from an indictment is narrow, however. *United States v. Jordan,* 626 F.2d 928, 931 n. 1 (D.C.Cir.1980). "Words of description of what is legally essential to the charge in the indictment cannot be stricken as surplusage." WRIGHT, FEDERAL PRACTICE AND PROCEDURE: CRIMINAL § 127, at 426. Material that can fairly be described as "surplus" may only be stricken if it is irrelevant and prejudicial. *Id.; see also United States v. Rezaq,* 908 F.Supp. 6, 8 (D.D.C.1995); *United States v. Poindexter,* 725 F.Supp. 13, 35 (D.D.C.1989).

■■■■ The district court made no finding that the stricken allegations were either irrelevant or prejudicial. Rather, the court stated that the allegations "allege facts which implicate protections of the First Amendment." 924 F.Supp. at 243. It is not entirely clear what the court meant. Oakar and DeMio are not being prosecuted for publication or distribution of a community newspaper or other campaign material. Rather, they are being prosecuted for a conspiracy to deceive the FEC as to the campaign contributions and expenditures that Oakar was required to report. Allegations that Oakar and DeMio obtained a loan to finance the publication of such newspapers, and failed to report that activity to the FEC are plainly relevant to the charged conspiracy. That individual allegations of the indictment may be cumulative does not comport with the strict test for striking surplusage under Rule 7(d). *See Jordan,* 626 F.2d at 931 n. 1. Hence, we hold that the district court erred in striking the challenged allegations.

Accordingly, we affirm the dismissal of count two of the indictment and reverse the striking of allegations from count four of the indictment, and remand the case to the district court.

STEPHEN F. WILLIAMS, Circuit Judge, concurring in part and dissenting in part:

My colleagues carve out what is to me an inexplicable exception to the coverage of 18 U.S.C. § 1001. Finding no basis for this exception, I dissent.

\* \* \*

Count Two of the indictment charges former Representative Mary Rose Oakar with having knowingly made a false statement, on or about May 15, 1992, in the form of a financial disclosure statement filed with the Clerk of the House. In the statement, according to the government, Oakar omitted at least $50,000 of personal liabilities. At the time of the alleged offense, § 1001 made it criminal to make a false statement "in any matter within the jurisdiction of any department or agency of the United States." 18 U.S.C. § 1001. Under *Hubbard v. United States,* 514 U.S. 695, 115 S.Ct. 1754, 131 L.Ed.2d 779 (1995), it is clear that the latter phrase embraces only *executive* branch de-

---

13. The district court did not address Oakar's contention that she was not required to report these activities under the Campaign Act. *Id.* at

242 n. 19. Because our task on appeal is limited to a determination of whether the district court

partments or agencies.[1] It follows, therefore, indisputably, that the filing of the statement with the House Clerk could not, *in itself,* be criminal under § 1001.

But established precedents, not disputed by Oakar, make it clear that § 1001 embraces false statements made *to* anybody on earth *if* the maker "knew or should have known that the information was to be submitted to a government agency." *United States v. Yermian,* 468 U.S. 63, 66–67, 104 S.Ct. 2936, 2938, 82 L.Ed.2d 53 (1984).[2] Indeed, the cases are legion in which § 1001 liability was grounded on statements not made *to* a federal agency at all. These include statements made to *private organizations* such as a defense contractor, as was the case in *Yermian* itself (false statements made by an employee to a defense contractor that in turn submitted them to the Department of Defense); an environmental group, see *United States v. Oren,* 893 F.2d 1057, 1064–65 (9th Cir.1990) (false statement made to a private conservation organization regarding land that at the time of the statement the National Park Service had power to and later did acquire); a private coal mine operator, see *United States v. Gibson,* 881 F.2d 318, 320–21 (6th Cir.1989) (false invoices submitted to contractor for costs that were to be passed on to the government under a cost-plus contract with TVA); a subsidiary of a federally insured bank, see *United States v. Cartwright,* 632 F.2d 1290, 1291 (5th Cir.1980) (false statements made in manipulating funds of bank's subsidiary); and a firm building a nuclear plant, see *United States v. Green,* 745 F.2d 1205 (9th Cir.1984) (test data submitted by paint supplier to contractor, falsely indicating that paint met standards of Nuclear Regulatory Commission). And liability has been based on false statements to *state agencies.* See *United States v. Davis,* 8 F.3d 923 (2d Cir.1993) (false statements submitted by federal prisoner to authorities of state prison in which he was held under contract);

*United States v. Wright,* 988 F.2d 1036 (10th Cir.1993) (false statements to a state environmental agency with primary enforcement responsibility for federal water quality standards); *United States v. Suggs,* 755 F.2d 1538 (11th Cir.1985) (false statement to state labor department in connection with federally funded program); but cf. *United States v. Facchini,* 874 F.2d 638, 642–43 (9th Cir.1989) (en banc) (finding no liability for false statements in support of unemployment claims, made to state agency whose administrative costs were federally supported, where federal monitor lacked power to modify payments on account of state's *excess* payments). And to *municipalities.* See *United States v. Petullo,* 709 F.2d 1178 (7th Cir.1983) (false invoices for snow removal from streets of Chicago after declaration of federal disaster area triggered federal support).

Until the Supreme Court's decision in *Hubbard,* the appellate courts had no occasion to tackle the parallel issue presented here—a statement given *to* the legislative branch but arguably in a matter within the jurisdiction of the executive branch. The formerly prevailing view read "department or agency" as including the legislative and judicial branches, see *United States v. Bramblett,* 348 U.S. 503, 75 S.Ct. 504, 99 L.Ed. 594 (1955), and made such an analysis pointless. The Second Circuit has recently, however, upheld a § 1001 conviction for false statements made to an assistant United States Attorney during negotiations to settle pending litigation before a magistrate judge, "notwithstanding the fact that the matter may also be within jurisdiction of a federal court." *United States v. Tracy,* 108 F.3d 473, 477 (2nd Cir.1997). Although the court noted that the statements had not been "presented to a federal court," *id.* at 477, it is not clear whether or how that comment may qualify the court's apparent acceptance of dual jurisdiction.

abused its discretion, we also do not address this issue.

1.. Since *Hubbard,* Congress has amended the statute to expand its reach to the judicial and legislative branches, with some exceptions. See False Statements Accountability Act of 1996 § 2(b), Pub.L. No. 104–292, 110 Stat. 3459 (Oct. 11,

1996). The extension of course does not apply to any conduct of Oakar in May 1992.

2. This formulation may understate the breadth of potential § 1001 liability for false statements to third parties. I return below to the issue of intent.

At the time of Oakar's filing there was a similar prospect of flow-through to a federal executive agency. For some time before the filing there had been widespread publicity about members' large and prolonged overdrafts at the House Bank, and on March 27, 1992 (six weeks before her filing), the Attorney General appointed former Judge Malcolm R. Wilkey as a special counsel to look into the possibility of crimes committed in connection with these overdrafts. He was *not* looking into the possibility of deception in statements filed under the Ethics in Government Act, so far as appears, but into a range of substantive crimes. And he, or the prosecutors who succeeded him after he filed his report, found them. See *United States v. Oakar,* 924 F.Supp. 232, 240 (D.D.C.1996) (tracing succession). At least two members of Congress and the wives of two members pleaded guilty to criminal charges, including conversion of government property and bank fraud, in violation of §§ 641 and 1344 of Title 18.[3] It was evidently in this pursuit that Wilkey or his successors came across the allegedly false Oakar statement. See uncontradicted assertion in Appellant's Brief at 22. Cf. Appellee's Reply Brief at 26 (asserting that implications of government's theory resting liability on pendency of the investigation were broad, but not questioning its premises). See also Final Report: Preliminary Inquiry of the Special Counsel to the Attorney General Concerning the House Banking Facility 38 (Dec. 16, 1992) (describing investigatory methods as including computerized review of House Bank records, supplemented by review of "filings under ... the Ethics in Government Act to determine whether transactions were being concealed.") [Exhibit 5 to Defendant's Motion to Dismiss Count One, *United States v. Oakar,* Crim.

No. 95–0043 (D.D.C., June 30, 1995) (Dkt. 20).]

In a trial the government might not be able, in the end, to show that Oakar knew or ought to have known that the statement filed with the House Clerk would be submitted to the Department of Justice (in the form of special counsel Wilkey or his successors). But that is a matter for trial, not a reason for dismissing Count Two. The indictment charges Oakar with making a false statement "in a matter within the jurisdiction of an agency of the United States." The pleading of a crime in the statutory form normally suffices. See *Hamling v. United States,* 418 U.S. 87, 117, 94 S.Ct. 2887, 2907–08, 41 L.Ed.2d 590 (1974) (indictment can set forth offense in language of statute itself as long as that language clearly sets out all elements). Here the indictment adds some surplusage, saying that Oakar made the false statement by filing with the House Clerk a Financial Disclosure Statement for 1991 that omitted $50,000 in liabilities. On the basis of liability for statements made to private organizations, state agencies and municipalities, the additional allegations are perfectly consistent with liability under § 1001.

My colleagues, however, insist that the qualified congressional grant of jurisdiction to the Attorney General to pursue *civil* penalties against members of Congress failing to file required statements, or filing false ones, on a reference by the House Ethics Committee, see § 104 of the Ethics in Government Act, 5 U.S.C. app., negates any coverage by § 1001. To be more exact, the majority reformulates the question: "Thus, the question is whether, by granting the Attorney General authority to seek civil penalties for the making of false statements and to appoint Judge

---

**3.** See *United States v. Solarz,* Crim. No. 95–93 (D.D.C., April 18, 1995) (criminal information prepared by House Bank Task Force charging wife of former Congressman with two misdemeanors, including one count of conversion under 18 U.S.C. § 641; plea agreement filed same day at Dkt. 1); *United States v. Carroll Hubbard, Jr.,* Crim. No. 94–0128 (D.D.C., April 5, 1994) (criminal information prepared charging former member of Congress with stealing and conversion of government property, 18 U.S.C. § 641; plea agreement filed same day at Dkt. 7); *United States v. Carol Brown Hubbard,* Crim. No. 94–

0127 (D.D.C., April 5, 1994) (criminal information charging defendant with aiding and abetting Carroll Hubbard in his violation of 18 U.S.C. § 641; plea agreement filed same day); and *United States v. Perkins,* Crim. No. 94–0480 (D.D.C., Dec. 13, 1994) (criminal information charging former member of Congress with violating bank fraud statute, 18 U.S.C. § 1344; plea agreement filed same day at Dkt. 2). [Exhibits A, E, F & C to Government's Memorandum of Points and Authorities at 6–7, *United States v. Oakar,* Crim. No. 95–0043 (D.D.C., June 30, 1995) (Dkt. 32).]

Wilkey to investigate the House Bank scandal, Congress intended to create Executive Branch jurisdiction within the meaning of § 1001." Maj. Opin. at 155. But unless there was some *other* doctrine under which false statements in the House are exempt from § 1001 liability (where parallel statements to a private organization, a state, or a municipality would be covered), this is pure intellectual ju-jitsu. (It also misperceives the government's theory here. The appointment of Judge Wilkey, evidently a simple exercise of the Attorney general's authority to delegate his own functions, see 28 U.S.C. § 510, is of significance only in that it put Oakar on clear notice that her financial disclosures, in any form, were likely to come under Justice Department scrutiny.) The majority's real theory is evidently that § 104 of the Ethics in Government Act itself negates the sort of liability that would attach to Oakar if, as a private citizen, she made a false statement to another private citizen, which a federal executive investigation was likely to find in the course of properly pursuing matters within its authority.

If the claim of implicit exemption were an issue of first impression, it would seem weak to me. But it is not. We have already rejected such a reading of the Ethics in Government Act. In a decision written by then-Circuit Judge Scalia, *United States v. Hansen*, 772 F.2d 940, 945 (D.C.Cir.1985), we said: "There is no difficulty in applying both 18 U.S.C. § 1001 and [§ 104 of the Ethics in Government Act].... [T]hose who intentionally fail to file [Ethics in Government Act] forms are subject only to the civil sanction ... while those who lie on their forms are additionally subject to the criminal penalty of § 1001." *Id.*

My colleagues attempt to discount *Hansen* on the grounds that it was decided before *Hubbard,* in an era when, under controlling precedents, Congress was a "department or agency" within the meaning of 18 U.S.C. § 1001. Maj. Op. at 155. But *Hubbard* merely removes one basis for finding the statement covered. Far from holding that Congress did not intend "to authorize § 1001 prosecutions for statements made to the Legislative Branch," Maj. Op. at 155, it simply

establishes that neither the House nor its Clerk nor the House Ethics Committee is a "department or agency" within the meaning of § 1001. See *United States v. Dean,* 55 F.3d 640, 658–59 (D.C.Cir.1995) (rejecting attempt of government to rest liability solely on testimony misleading a Senate Committee). Nothing in *Hubbard* suggests that statements to organizations not covered by 18 U.S.C. § 1001 cannot be prosecuted under 18 U.S.C. § 1001 if they are also on matters within the jurisdiction of an executive branch "department or agency." Nor did *Hubbard* suggest that a matter could not be within the jurisdiction of departments or agencies of the executive as well as of one (or both) of the other branches. Since *Hansen* says simply that § 104 of the Ethics in Government Act does not negate § 1001 liability, it is still good law; *Hubbard* means only that the government cannot rest on the notion that Congress or one of its committees is a covered "department or agency." Given the established cases finding liability even for statements made to entities other than covered departments or agencies, *Hubbard* has no effect on *Hansen*'s essential point. Persons making statements to Congress under circumstances that would entail liability if made to a private organization such as General Motors remain as liable as ever. The government should have a chance to show that Oakar's conduct fits within these principles.

The majority suggests that failure to exempt statements made in a matter in the jurisdiction of the judicial and legislative branches could lead to § 1001 prosecutions for ordinary trial perjury; because the perjurious statement would itself be likely to precipitate a Department of Justice investigation and prosecution, the perjuror would be on adequate notice under *Yermian*. Maj. Op. at 156. Perhaps so—but resolution would seem to turn more on such issues as how one defines the Justice Department's "jurisdiction," and whether the perjurious statement itself was "in a matter" within that jurisdiction, see pp. 161–62 below, than on whether statements in courtrooms are somehow immune from § 1001. Except in jurisdictions applying the judicially invented "exculpatory no" exception, false statements made in mat-

ters that the Justice Department already is investigating trigger § 1001 liability, see, e.g., *United States v. Wiener*, 96 F.3d 35 (2d Cir.1996), even though the prosecutor might also seek an obstruction of justice conviction under 18 U.S.C. § 1503. Compare *United States v. Grubb*, 11 F.3d 426, 436–38 (4th Cir.1993) (finding that false statement to FBI agent can be basis of obstruction of justice charge) with *United States v. Aguilar*, 21 F.3d 1475, 1486 (9th Cir.1994) (rejecting such a theory). Counts Three and Seven of the Indictment explicitly charge Oakar under such a theory. It is hard for me to see why it should make a difference that an intermediary (the Clerk of the House) stood between Oakar and the Department's investigative staff in regard to the statement that is subject of Count Two. Cf. *Tracy*, 108 F.3d at 476–77.

\* \* \*

The 1996 amendments to § 1001, extending "department or agency" to encompass the legislative and judicial branches, see n.1 above, render the current issue a matter of history (except, of course, to Oakar and the government). But this case forces one to ponder the implications of applying § 1001 to statements not made *to* a "department or agency." The Supreme Court made that application clear in *Yermian*, rejecting the defendant's claim that guilt required "actual knowledge of federal involvement." 468 U.S. at 74, 104 S.Ct. at 2942. The Court upheld a conviction based on a jury instruction that the defendant could be found guilty if he "knew or should have known that the information was to be submitted to a government agency," *id.* at 66–67, 104 S.Ct. at 2938, and left open the question of whether even reasonable foreseeability was required, *id.* at 75 n. 14, 104 S.Ct. at 2943 n. 14. The Court in places appeared to take the view that the "in any matter" clause was intended only to be sure that the statute was "limited to issues of federal concern." *Id.* at 74, 104 S.Ct. at 2942. In the modern world, that is scarcely any limit at all. Thus *Yermian* might be read to permit § 1001 to reach any material, knowing false statement that turns out to have a fortuitous federal involvement—for example, a statement that the IRS happens

upon in the course of a tax audit, or a casual falsehood made in the unknown presence of a federal officer and somehow pertinent to his mission.

There has been some judicial resistance to *Yermian*. In one case the majority applied it faithfully, but with the comment that "[i]t implies no disrespect to say that *Yermian* is not as firmly entrenched in our jurisprudence as *McCulloch v. Maryland*, say, or *Brown v. Board of Education*." *United States v. Gibson*, 881 F.2d 318, 323 n. 2 (6th Cir.1989). The dissenter, on the basis of a head count of justices in the *Yermian* majority no longer on the Court, declared that the case was no longer "good law" and declined to apply it. See *id.* at 324–25.

Of course, the Court may ultimately resolve *Yermian*'s open question in favor of a narrow construction, requiring evidence that the defendant should have known of the prospective federal involvement. While the Court there pointed to alternative language by which Congress *could have* explicitly preserved a requirement of intent to mislead federal authority, *Yermian*, 468 U.S. at 73, 104 S.Ct. at 2941–42, it does not follow, from Congress's failure to choose that language, that it intended to dispense with the traditional rule associated with common law fraud that the maker of a statement to a third party (i.e., one other than the actual victim) must have "intend[ed] or [have] reason to expect that its terms will be repeated or its substance communicated to the other." Restatement (Second) of Torts § 533.

The parties have not raised the issue of alternative sources of limits, but a couple (besides the question *Yermian* explicitly left open) deserve mention. The statute imposes liability only for a statement made "*in any matter* within the jurisdiction of any department or agency of the United States." 18 U.S.C. § 1001 (emphasis added). The word "matter" suggests a case or inquiry. It also suggests an *existing* matter, i.e., a pending one—or at least one likely to be launched as a foreseeable result of a false statement made to a department or agency. Compare *United States v. Rodgers*, 466 U.S. 475, 104 S.Ct. 1942, 80 L.Ed.2d 492 (1984) (liability for

false statement to FBI setting it off on a pointless investigation).

Moreover, it is not clear that a person is making a statement "*in* any matter" if a reasonable person in his position would not have foreseen the statement's connection to the "matter." The Court in *Yermian* noted that Congress in its 1934 amendment of the statute deleted the "specific intent" provision, which had required that the statement be made "for the purpose and with the intent of cheating and swindling or defrauding the Government of the United States or any department thereof." *Yermian,* 468 U.S. at 70–74, 104 S.Ct. at 2940–42. But deletion of that phrase hardly compels the conclusion that Congress intended liability where the defendant was unaware of any link to a federal "matter." All agree that the catalyst for the change was the "hot-oil" scandal of the 1930s, which involved false statements that had been submitted to the government, and whose falsity tended to thwart its regulatory goals. But they had not been submitted for the purpose of securing *payment* from the federal government, and were thus outside the predecessor act. See *Hubbard,* 514 U.S. at ——, 115 S.Ct. at 1761. The regulatory program's efficacy depended on the regulated firms' submission of accurate information. There appears no comparable dependence on the reliability of information acquired serendipitously.

Of course these issues are not now before us. I mention them only to make the point that, on the one that is, the government's reading of the statute does not inevitably lead to a complete metastasis of § 1001 liability.

I agree with the court's reversal of the district court's striking of certain allegations from Count Four of the indictment. But because I disagree with the exclusion of § 1001 liability, derived from the supposed effect of § 104 of the Ethics in Government Act, I respectfully dissent.

